# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SHEA M.[1], | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:21-CV-02204 (GMH) |
| | ) | |
| KILOLO KIJAKAZI, Commissioner of Social Security, | ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff Shea M. brought this action seeking to reverse the final decision of the Commissioner of Social Security, Kilolo Kijakazi ("Defendant" or "the Commissioner"), denying Plaintiff's application for Supplemental Security Income ("SSI") benefits under Title II of the Social Security Act, 42 U.S.C. § 405(g). She alleges that the Administrative Law Judge ("ALJ") erred in several respects when determining that she had the residual functional capacity ("RFC") to perform light work with some additional limitations. Specifically, she contends that the ALJ failed to consider certain evidence, that he improperly evaluated the opinion evidence, and that his hypothetical questions to the vocational expert ("VE") were flawed. She seeks reversal of the Commissioner's decision and a judgment that she is entitled to benefits or, in the alternative, remand for a new administrative hearing. The Commissioner argues that the ALJ's decision should be affirmed.

---

[1] Plaintiff's name has been partially redacted in accordance with the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States. *See* Memorandum from Hon. Wm. Terrell Hodges, Chair, Comm. on Ct. Admin. & Case Mgmt. to Chief Judges of the U.S. Cts. of Appeals, Chief Judges of the U.S. Dist. Cts., Clerks of the U.S. Cts. of Appeals, and Clerks of the U.S. Dist. Cts. (May 1, 2018), *available at* https://www.uscourts.gov/sites/default/files/18-ap-c-suggestion_cacm_0.pdf (last visited Apr. 20, 2023).

Upon consideration of the parties' briefs and the administrative record, the Court will deny the Commissioner's motion for affirmance, deny Plaintiff's motion to the extent it seeks reversal, but grant Plaintiff's motion to the extent that it seeks remand to the Social Security Administration for further administrative proceedings.[2]

## I.   BACKGROUND

### A.   Statutory and Regulatory Framework

To be eligible for SSI benefits under the Social Security Act, the Social Security Administration must find a claimant to be "disabled," meaning that the individual is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  To make that determination, an ALJ gathers evidence, holds a hearing, takes testimony, and performs the following five-step, sequential inquiry of the disability claim:

Step one:  whether the claimant is engaging in "substantial gainful activity";[3]

Step two:  whether the claimant has a "severe" medically-determinable physical or mental impairment or combination of impairments;[4]

---

[2] The relevant docket entries for purposes of this Memorandum Opinion are (1) the administrative record (ECF No. 11), (2) Plaintiff's motion for judgment of reversal (ECF No. 18), (3) Defendant's motion for judgment of affirmance and opposition to Plaintiff's motion for judgment of reversal (ECF No. 20), and (4) Plaintiff's opposition to Defendant's motion for judgment of affirmance/reply in further support of Plaintiff's motion for judgment of reversal (ECF No. 23).  The page numbers cited herein are those assigned by the Court's CM/ECF system.

[3] "Substantial gainful activity" is work that "involves doing significant and productive physical or mental duties" and is "done (or intended) for pay or profit."  20 C.F.R. § 416.910; *see also* 20 C.F.R. § 404.1510 (defining "substantial gainful activity" for the purposes of Social Security disability insurance benefits ("DIB") claims).  "If [the claimant is] doing substantial gainful activity, [the Social Security Administration ("SSA")] will find that [the claimant is] not disabled."  20 C.F.R. § 416.920(a)(4)(i); *see also* 20 C.F.R. § 404.1520(a)(4)(i) (defining the step one inquiry for DIB claims).

[4] An impairment or combination of impairments is "severe" if it "significantly limit[s]" a claimant's "physical or mental ability to do basic work activities," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "seeing, hearing, [or] speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; exercising judgment; "[r]esponding appropriately to supervision, co-workers[,] and usual work situations"; or "[d]ealing with changes in a routine work setting."  20 C.F.R. § 416.922; *see also* 20 C.F.R. § 404.1522 (defining a severe impairment for the purposes of DIB claims).

Step three:  whether the claimant's impairment is equivalent to one of the disabling impairments listed in the appendix of the relevant regulation, 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings");

Step four:  whether the impairment prevents the claimant from performing his or her past relevant work;[5] and

Step five:  whether the claimant, in light of his or her age, education, work experience, and RFC—i.e., the most he or she is able to do notwithstanding his or her physical and mental limitations—can still perform another job available in the national economy.

See 20 C.F.R. § 416.920; see also 20 C.F.R. § 404.1520 (outlining the five-step sequential inquiry for the purposes of DIB claims); Butler v. Barnhart, 353 F.3d 992, 997 (D.C. Cir. 2004).  "An affirmative answer to question 1 or negative answers to questions 2 or 4 result in a determination of no disability.  Affirmative answers to questions 3 or 5 establish disability." Hines v. Bowen, 872 F.2d 56, 58 (4th Cir. 1989).

The claimant bears the burden of proof at the first four steps of the evaluation. Callahan v. Astrue, 786 F. Supp. 2d 87, 89 (D.D.C. 2011).  At step five, the burden shifts to the Commissioner to identify specific jobs available in the national economy that the claimant can perform. Id.  In making this determination, an ALJ may call a vocational expert to testify at the hearing as to whether, based on the claimant's RFC, he or she can perform other work that exists in the national economy. Id. at 90.

### B.   Plaintiff's Disability Claims and Procedural History

Plaintiff was born on May 25, 1979 and has a high-school diploma.  ECF No. 11-2 at 40.

---

[5] "Past relevant work" is work "done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it."  20 C.F.R. § 416.960(b)(1); see also 20 C.F.R. § 404.1560(b)(1) (defining "past relevant work" for the purposes of DIB claims).  If the claimant can perform his or her past relevant work, a finding of "not disabled" is mandated.  20 C.F.R. § 416.920(a)(4)(iv); see also 20 C.F.R. § 404.1520(a)(4)(iv) (defining the step four inquiry for DIB claims).

Her earnings records show a small amount of work income in 2013 and none since. ECF No. 11-5 at 14.

On May 28, 2019, the Plaintiff filed an application for SSI, alleging disability beginning January 1, 2017. ECF No. 11-3 at 16. Plaintiff claimed disability due to schizophrenia, psychosis, and a ruptured bone in her left leg. *Id.* Her claim was denied initially on November 21, 2019, and upon reconsideration on April 20, 2020. ECF No. 11-4 at 2, 10. She thereafter requested a hearing before an ALJ. *Id.* at 13. On November 23, 2020, with Plaintiff's consent, an ALJ held a telephonic hearing due to the extraordinary circumstance presented by the Coronavirus pandemic. ECF No. 11-2 at 35–65. Plaintiff appeared at the hearing via telephone and was represented by counsel. *Id.* A vocational expert also testified at the hearing. *Id.*

Plaintiff testified that from 2011 to 2013 she worked as a child-care attendant and preschool teacher's aide. *Id.* at 41. She stated that she stopped working in this position in 2013 because "[t]hey said I wasn't paying attention to the children or something," and she had not applied for a job since. *Id.* Plaintiff confirmed that she lives in the District of Columbia, and that she has lived by herself, in the same apartment, for roughly two years. *Id.* at 42. She said that she does not have a driver's license but takes the bus once a month to see her doctor. *Id.* at 42–43. Specifically, Plaintiff testified that she has a friend come with her, taking multiple bus lines to travel from her apartment in Southeast D.C. to her doctor's office in Northeast D.C. *Id.* at 42–44. Plaintiff explained that she "barely[s] go[es] outside" because she is "scared," and that she has a friend come with her because without her friend, she would get in "[a] lot of trouble" because she would otherwise think that "somebody" is "after [her] and stuff like that." *Id.* In response to the ALJ's questions, Plaintiff stated that she had no hobbies, did not socialize with friends, and had not been outside of the Washington D.C. area for any reason in the prior two years. *Id.* at 44–45. Plaintiff

also testified that the medications she was taking were "sometimes" helpful, and that when she takes her medications, she does not hear voices. *Id.* at 45.

Regarding her mobility, Plaintiff testified that she is not able to walk three blocks because her "legs will give out," and that the bus stop she uses is less than one block from her apartment. *Id.* at 45–46. Plaintiff said she could only stand for five minutes before needing to sit down because otherwise she feels her left leg would break, and she further testified that she could sit for roughly thirty minutes before needing to get up to shake her left leg. *Id*. at 46–47. Plaintiff continued that because she can "lift nothing," she has someone go to the grocery store for her. *Id.* She also said that she cannot climb stairs, explaining that both her apartment and her doctor's office are on the first floor, and that she uses the ramp to board the bus. *Id.* As for household chores, Plaintiff said that her friend does the laundry, dishes, sweeping, and vacuuming and also takes out the trash. *Id.* at 49.

The ALJ then asked Plaintiff about her ability to concentrate. *Id.* at 48. Plaintiff answered in the affirmative when asked if she had trouble with her concentration. *Id.* The ALJ then inquired about the records in Plaintiff's file that indicated she liked reading books and cooking. *Id.* In response, she testified that she does not read books, and that she does not cook but instead eats microwave dinners. *Id.* The ALJ then asked Plaintiff why she thought she had been unable to obtain and hold a job. *Id.* The Plaintiff answered that she cannot "stay focused," and that her "mind wanders." *Id.*

Next, the ALJ asked the Plaintiff about the records in her file which indicated that she told her doctor that she traveled to Myrtle Beach in May 2019 to celebrate her 40th birthday. *Id.* at 50. Plaintiff responded that she had never been to Myrtle Beach, did not remember telling her doctor that, and again testified that she had not left town since May 2019. *Id.*

In response to follow up questions from her counsel, Plaintiff testified that she used to enjoy reading, but that her "mind is not focused on reading right now." *Id.* at 52. Plaintiff also testified that hearing voices makes it difficult to concentrate, and that she hears voices every day, even when taking her medication. *Id*. at 53–56.

Next, the ALJ presented a series of hypothetical questions to the vocational expert. First, he proposed a hypothetical individual of the same age, education, and vocational background as Plaintiff, who was limited to light work as defined in the SSA, with the following additional limitations: she can stand and/or walk for two hours out of an eight-hour workday; occasionally operate foot controls with the left lower extremity; frequently operate foot controls with the right lower extremity; never climb ladders, ropes, or scaffolds and occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and/or crawl; perform only jobs that can be executed while using a cane for ambulation; must avoid concentrated exposure to extreme cold, wetness, excessive vibration, hazardous moving machinery, and unprotected heights; perform only simple, routine, repetitive tasks in a  low-stress work environment (with low stress defined as no strict production quotas, no assembly line pace work) involving occasional interaction with supervisors, co-workers, and the public; and changes in work duties must be introduced gradually. *Id.* at 57–58. The VE answered that such a hypothetical individual could not perform Plaintiff's past work but could perform jobs within the national economy including Router, Marker, and Non-Postal Mail Clerk positions. *Id.* at 58. If the hypothetical individual was further restricted to only sedentary work (rather than light work) as defined by the SSA regulations, the VE stated that such an individual could still perform jobs in the national economy, including Addresser, Assembler, and Document Preparer. *Id.* at 59.

Next, as relevant here, Plaintiff's counsel asked the VE whether there would be jobs in the

national economy if the hypothetical individual would further require the assistance of another person to follow two-step commands. *Id.* at 60–61. The VE answered that such a person would not be employable. *Id.* at 27. Alternatively, Plaintiff's counsel asked if the hypothetical individual would be employable if she suffered from distracting hallucinations that made concentration difficult. *Id.* The VE explained that if a concentration deficiency resulted in a productivity loss of fifteen percent or greater, then such a person would not be employable. *Id.*

### C. The ALJ's Decision

On December 24, 2020, the ALJ issued a decision denying Plaintiff's claim. *Id.* at 13–29. That decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review in June 2021. *Id.* at 2–7. The following summation of the ALJ's decision will focus on those issues that are the subject of this appeal.

#### 1. Substantial Gainful Employment, Severe Impairments, and the Listings

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the date of her SSI application. ECF No. 11-2 at 18. At step two, he found that the Plaintiff had the following impairments that could be classified as "severe" under the regulations: status-post left lateral tibia plateau fracture and open reduction and internal fixation, status-post right fibula fracture, bilateral knee osteoarthritis, status-post left lateral meniscus tear, left knee arthrofibrosis, left knee Pellegrini-Stieda lesion, osteopenia, schizophrenia, schizoaffective disorder, bipolar disorder, and post-traumatic stress disorder. *Id.* At step three, the ALJ found that, either singly or in combination, Plaintiff's physical impairments did not meet or medically equal the severity of any of the impairments in the Listings, including Listing 1.06, which addresses fractures of the femur, tibia, pelvis or tarsal bones, and Listing 1.02, which addresses dysfunction of major weight-bearing joints. *Id.* at 18–19.

The ALJ also determined that Plaintiff's medically determinable mental impairments of schizophrenia, schizoaffective disorder, bipolar disorder, and post-traumatic stress disorder, considered singly and in combination, do not meet or medically equal the criteria of Listings 12.03, 12.04, or 12.15.  *Id.* at 19–21.   In making this determination the ALJ considered whether the "paragraph B" criteria of the listings were satisfied.  *Id.*  To satisfy the "paragraph B" criteria, Plaintiff's mental impairments must result in at least one extreme or two marked limitations[6] in the following areas of functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing themselves.  *Id.*  The ALJ found that Plaintiff had only a moderate limitation with respect to each of those four domains, and thus did not meet the paragraph B requirements.  *Id.* at 20.

In making that determination, the ALJ relied on Plaintiff's "routine mental health treatment," her largely unremarkable mental status examination findings and her "significant activities of daily living."  *Id.*  Specifically, the ALJ observed that Plaintiff's "treatment history for her mental health issues has been conservative, limited predominantly to prescription medication and counseling with no evidence of significant in-patient treatment or hospitalizations due to mental health concerns from the relevant period."  *Id*; *see generally* ECF No. 11-7.  Her mental status examinations, while showing "some issues with anxiety, mood, and anger," also typically found her to be "alert and oriented with a cooperative attitude, normal speech, logical thought process, intact associations, appropriate thought content, no suicidal or homicidal ideation, and fair insight and judgment."  ECF No. 11-2 at 20.  Moreover, she was often found to have "normal appearance, fair recent and remote memory, fair attention span and concentration, and

---

[6] A marked limitation means functioning in the area "independently, appropriately, effectively, and on a sustained basis is seriously limited[.]" ECF No. 11-2 at 19; *see* 20 C.F.R § 404.1520a.  An extreme limitation is the "[inability] to function in this area independently, appropriately, effectively, and on a sustained basis." ECF No. 11-2 at 19–20; *see* 20 C.F.R § 404.1520a.

fair fund of knowledge." *Id.* As an example, the ALJ gave weight to the fact that, in her consultative examination, Plaintiff was dressed appropriately, maintained good eye contact, and was properly oriented. *Id.* (citing ECF No. 11-9 at 300). The ALJ acknowledged that while Plaintiff had "some" memory impairment and a diminished affect, she also revealed no evidence of hallucinations or delusions, no evidence of impaired judgment, and no suicidal ideation. *Id.*

The ALJ also relied on what he characterized as Plaintiff's "extensive" activities of daily living. *Id.* Specifically, the ALJ pointed to records that Plaintiff vacationed in Myrtle Beach for her birthday in May of 2019; records that indicated she cooks, and enjoys reading; and her statement in May 2020 that she "like[s] to go do stuff." *Id.* (citing ECF No. 11-9 at 163, ECF No. 11-10 at 36). Additionally, the ALJ relied on Plaintiff's function report where she indicated that she needs no reminders for personal needs or grooming, can prepare her own meals, and can perform household chores without encouragement. *Id.* (citing ECF No. 11-6 at 23–33). On that same report, Plaintiff further indicated that she is able to use public transportation, go shopping in stores, pay bills, count change, handle a savings account, and use a checkbook and money orders. *Id.* Finally, she also stated that she spends time with others on occasion and is able to go out alone. *Id.* In sum, the ALJ determined that given Plaintiff's history of conservative mental health treatment, unremarkable mental status examinations, and activities of daily living, her impairments result in, "at most, moderate limitations to the four [paragraph B] functional categories." ECF No. 11-2 at 20. The ALJ found no record evidence that the "paragraph C" criteria of Listings 12.03, 12.04, and 12.15 were met, which include "a minimal capacity to adapt to changes in [the claimant's] environment or to demands that are not already part of [her] daily life. *Id.* at 21.

2.    Plaintiff's RFC

At step four, the ALJ found that Plaintiff had the RFC to perform "light work" except that she can stand and/or walk for only two hours out of an eight-hour workday; occasionally operate foot controls with the left lower extremity; frequently operate foot controls with the right lower extremity; never climb ladders, ropes, or scaffolds and occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and/or crawl; is limited to jobs that can be performed while using a cane for ambulation; must avoid concentrated exposure to extreme cold, wetness, excessive vibration, hazardous moving machinery, and unprotected heights; can perform only simple, routine, repetitive, low-stress jobs (no strict production quotas, no assembly line pace work) involving occasional interaction with supervisors, co-workers, and the general public; and can adapt to changes in work duties only if they are introduced gradually.  *Id.*  SSA regulations define "light work" as involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . .  [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 416.967(b).  SSR 83-10 further explains that "the full range of light work requires standing or walking, off and on, for . . . approximately 6 hours of an 8-hour workday."  SSR 83-10, 1983 WL 31251, at *5–6.

In determining that RFC, the ALJ explained that he considered all of Plaintiff's symptoms, and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence.  ECF No. 11-2 at 21.  The ALJ further noted that he also considered the medical opinions and prior administrative medical findings.  *Id.*  The ALJ also explained that he engaged in the required "two-step process" when analyzing Plaintiff's symptoms, first considering whether her medically determinable impairments could be expected

to produce her symptoms, and then evaluating the intensity, persistence, and limiting effects of her symptoms to determine the extent to which they limited her work-related activities. *Id.* Ultimately, the ALJ found that while Plaintiff's impairments could reasonably be expected to cause her symptoms, the alleged intensity, persistence, and limiting effects of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record." *Id.* at 22.

In reaching that conclusion, the ALJ summarized Plaintiff's own statements concerning her mental health symptoms and their impact on her ability to work and perform daily activities. *Id.* As relevant here, the ALJ pointed to records where Plaintiff indicated that she is able to prepare her own meals, perform household chores, and shop in stores. *Id.* The ALJ next observed that in Plaintiff's function report, she alleged that her impairments affect her ability to lift, squat, bend, stand, reach, walk, kneel, climb stairs, remember, complete tasks, concentrate, understand, follow instructions, and get along with others. *Id.* Specifically, Plaintiff estimated that she could lift no more than one pound and walk approximately one mile before needing fifteen to twenty minutes rest. *Id.* She estimated that she could pay attention for only thirty minutes, does not finish what she starts, struggles to follow written and spoken instructions, does not get along with authority figures, and does not handle stress or changes in routine well. *Id.* The ALJ next turned to Plaintiff's hearing testimony where she testified that she could not walk very far, stand for only five minutes, and sit for thirty minutes before needing to shift positions. *Id.* Finally, the ALJ recalled that Plaintiff estimated that "she could lift no weight and does not climb steps or push/pull." *Id.* Next, turning to Plaintiff's alleged mental health limitations, the ALJ highlighted Plaintiff's statement that she has difficulty concentrating and is unable to focus. *Id.* Further, the ALJ recalled Plaintiff's allegations that she needs assistance in performing household chores like laundry, leaves the house only once per month, experiences paranoia and hallucinations, and has

anger issues.  *Id.*

Next, the ALJ discussed the medical evidence concerning Plaintiff's musculoskeletal issues.  *Id.* at 22–23.  Providing the relevant background, the ALJ noted that Plaintiff injured her left knee during an altercation in November 2017, which, as the ALJ observed, was before the period at issue.  *Id.*  As relevant here, the ALJ also noted that Plaintiff was hospitalized for approximately two weeks, had surgery on the knee (without complications), and was treated with medication and physical therapy throughout 2018.  *Id.*

Turing to the period at issue, the ALJ first pointed to images of Plaintiff's left knee taken in October of 2019, which showed some ossification of the medial collateral ligament, but also noted a healed left tibial plateau fracture with no evidence of hardware complication, unremarkable soft tissues, and a maintained joint space.  *Id* at 23 (citing ECF No. 11-9 at 301).  The ALJ then recounted the results of diagnostic images performed on both Plaintiff's knees in December of 2019, which revealed ossification of the MCL, lineal ossification along the lateral femoral condyle, no joint effusion, and normal soft tissues.  *Id.* (citing ECF No. 11-9 at 309).  Those images further revealed intact hardware and a healed fracture of the left tibia, evidence of prior hardware within the distal femur, and a healed fracture within the proximal right fibula.  *Id.*  The ALJ concluded that the "results of these diagnostic images are inconsistent with an individual suffering from debilitating musculoskeletal impairments."  *Id.*

Next, the ALJ turned to Plaintiff's treatment history and observations throughout her various medical appointments.  *Id.*  The ALJ noted that although Plaintiff's injury did require surgery, her treatment during the period at issue was predominantly limited to prescription medication and physical therapy.  *Id.* (citing the record generally) The ALJ acknowledged that Plaintiff alleged that she experiences near-constant pain and discomfort, but "she was typically

noted to be in no distress throughout her medical appointments from the relevant period." *Id.* (citing ECF No. 11-7 at 210, 212, 215, 220, 223, 225; ECF No. 11-9 at 306, 307, 319, 323, 429, 430, 433, 435, 437, 438, 441; ECF No. 11-10 at 101). Likewise, the ALJ drew a contrast between Plaintiff's testimony that she cannot walk a block and records where she was "noted to ambulate with a normal gait on multiple occasions." *Id.* The ALJ further observed that although Plaintiff alleged that she was completely unable to lift or carry any weight, she was "often noted to have normal strength in her extremities throughout the relevant period." *Id.* Finally, the ALJ noted that during Plaintiff's October 2019 Consultative Examination she needed no help changing for the exam or getting on and off the exam table, and she rose from the chair without difficulty. *Id.* at 23–24. The ALJ thus concluded that, taken together, the observations of Plaintiff and the results of her diagnostic images did not support the extent of symptoms she alleged. *Id.*

The ALJ concluded that the totality of the medical evidence did not support debilitating physical issues. *Id.* at 24. Specifically, he found that the medical evidence revealed that Plaintiff's left tibia and right femur fractures had "healed," that she had "no significant upper extremity impairments," and that this conclusion was further supported by Plaintiff's own account of her daily activities as documented in her function report. *Id.* Nevertheless, "to accommodate the claimant's pain and lower extremity issues," the ALJ crafted an RFC that limited her to "ambulating no more than two hours out of an eight-hour workday with additional pushing/pulling limitations with her lower extremities, an allowance to use a cane for ambulation, and the additional postural and environmental limitations detailed [in the RFC]." *Id.*

Next the ALJ turned to Plaintiff's mental health impairments. Here, too, the ALJ ultimately concluded that the record did not support debilitating mental health symptoms. *Id.* The ALJ began by noting that Plaintiff's treatment history for her mental health issues had been conservative,

limited predominantly to prescription medications and counseling with no evidence of significant in-patient treatment or hospitalizations due to mental health concerns from the relevant period. *Id.* The ALJ also explained that the Plaintiff's medications seemed to be effective in relieving her symptoms, as Plaintiff stated, "[W]hen I take my medication I don't hear voices." *Id.* (citing ECF No. 11-9 at 149). The ALJ also discussed the records of Plaintiff's numerous mental health exams which noted some issues with anxiety, mood, and anger, but also typically found Plaintiff to be alert and oriented with a cooperative attitude, normal speech, logical thought process, intact associations, appropriate thought content, no suicidal or homicidal ideation, and fair insight and judgment. *Id.* Moreover, these same records often described Plaintiff as having a normal appearance, fair recent and remote memory, fair attention span and concentration, and fair fund of knowledge. *Id.* (citing ECF No. 11-8 at 430; ECF No. 11-9 at 34, 61, 94, 113, 119, 139, 164, 177, 201, 229, 256, 278, 346, 356, 370, 392, 418; ECF No. 11-10 at 35, 40, 58, 66; ECF No. 11-11 at 208; ECF No. 11-12 at 33, 38, 43, 48, 53, 58, 63, 68, 72, 76-77, 81, 89; then citing the record generally). The ALJ observed that these records were consistent with Plaintiff's consultative examination, which, while indicating "some" memory impairment and a diminished affect, also revealed no evidence of hallucinations or delusions, no evidence of impaired judgment, and no suicidal ideation. *Id.*

The ALJ found further support for his conclusion that Plaintiff was not suffering from debilitating mental health symptoms by reviewing Plaintiff's activities of daily living. *Id.* at 24–25. He recounted that although Plaintiff testified that she does not leave the house, according to her own treatment records, she traveled from her home in D.C. to Myrtle Beach, South Carolina, to celebrate her birthday in May 2019. *Id* at 24 (citing ECF No. 11-9 at 163). The ALJ also pointed to records from May 2020 that indicated that Plaintiff was bored during the coronavirus pandemic

lockdowns because "[she] like[s] to go do stuff." *Id.* (citing ECF No. 11-10 at 36). The ALJ also discussed records where Plaintiff indicated she sometimes enjoyed cooking and reading books. *Id.* (citing ECF No. 11-6 at 23–33). And finally, the ALJ noted that Plaintiff asserted in her function report that she needs no reminders for personal needs or grooming, can prepare her own meals, perform household chores without encouragement, use public transportation, go shopping in stores, pay bills, count change, handle a savings account, and use a checkbook and money orders. *Id* at 25. The same report indicated that she spends time with others on occasion and is able to go out alone. *Id.*

Finally, the ALJ concluded that the totality of the evidence, particularly Plaintiff's conservative treatment history, numerous normal mental status observations, and activities of daily living both as documented by the medical evidence and as reported by the Plaintiff herself, did not support the extent of symptoms as alleged by the Plaintiff. *Id.* Nevertheless, the ALJ also found that Plaintiff did have mental health issues which supported the additional non-exertional limitations he included in the RFC. *Id.*

The ALJ then turned to the opinion evidence. *Id.* at 25–27. Beginning with the opinion of State Agency medical consultants Lisa Venkataraman, M.D., and Eduardo Haim, M.D., the ALJ found they were persuasive. *Id.* at 25. The ALJ first noted that in their opinions, Plaintiff had the capacity to lift 20 pounds occasionally and 10 pounds frequently and stand/walk for two hours and sit for six hours out of an eight-hour workday. *Id.* The ALJ found that, "[a]s detailed in the analysis above, these opinions are both consistent with and supported by the medical evidence of record. *Id.* Specifically, the ALJ explained that the finding that the Plaintiff could lift up to 20 pounds was "consistent with the lack of significant impairment with regard to the claimant's upper extremities and the numerous findings of the claimant exhibiting normal strength." *Id.* The ALJ

also reasoned that the findings that the claimant was limited to only two hours of standing and/or walking, as well as use of her left lower extremity, was "consistent with the claimant's history of surgery and observations of cane use throughout her treatment history."  *Id.*  However, "out of an abundance of caution," the ALJ held that the record supported "slightly more restrictive" limitations than the opinions of Drs. Venkataraman and Haim suggested, but that that those minor additions did not detract from the supportability and consistency of their opinions.  *Id.*

Next, the ALJ concluded that the opinion of Marisela Gomez, M.D., was not persuasive because it used vague, undefined terms, leaving the ALJ unable to conduct a consistency and supportability analysis.  *Id.*  at 25–26.

The ALJ next considered the opinions of Nancy Heiser, Ph.D., and Gemma M. Nachbahr, Ph.D., both of which the ALJ found to be persuasive.  Drs. Heiser and Nachbahr opined that the Plaintiff experiences moderate limitations to her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workday and workweek without interruptions.  *Id.* at 26. Moreover, they found moderate limitations to the claimant's ability to interact appropriately with the public, accept instructions and respond appropriately to criticism, get along with coworkers and peers, maintain socially acceptable behavior, and respond appropriately to changes in the work setting.  *Id.*  The ALJ explained, "As detailed in the analysis above, these opinions are both consistent with and supported by the medical evidence of record."  *Id.*  Specifically, the ALJ reasoned that the opinions were "consistent with the fact that while the claimant has treatment for mental health issues, observations of the claimant typically found her to be alert and oriented with a cooperative attitude, with normal speech, logical thought process, intact associations, and appropriate thought content, no suicidal or homicidal ideation, and fair insight and judgment."  *Id.*

The ALJ further explained that the opinions were "further supported by the observations of the claimant with fair recent and remote memory, fair attention span and concentration, and fair fund of knowledge." *Id.* And lastly, the ALJ found that the opinions were "consistent with the claimant's activities of daily living, which reflect vacations, an interest in going out, and an ability to live independently." *Id.* Accordingly, the ALJ concluded that their "findings of only moderate limitations are generally consistent with and supported by the medical evidence, and they are determined to be persuasive." *Id.*

Finally, the last opinion that the ALJ considered was that of Cassandra Thompson MSN, FNP-BC, PMHNP-BC, from MBI Health Services. *Id.* (citing ECF No. 11-12 at 158–159). Nurse Practitioner Thompson opined that Plaintiff experiences marked limitations in her social functioning and her ability to go about daily activities, is unable to interact appropriately with co-workers or supervisors on a sustained basis, and is unable to respond appropriately to typical work situations or adjust to changes in the workplace. ECF No. 11-2 at 26. Nurse Practitioner Thompson also determined that working with others would be tedious for the Plaintiff, and that she is limited in her ability to function in a work setting. *Id.* The ALJ found Nurse Practitioner Thompson's opinion unpersuasive. *Id.* The ALJ explained that, "[n]otably, [her] opinion is not consistent with or supported by the very treatment notes from MBI Health Services [where she worked], which consistently noted in their mental status examinations that the claimant had a cooperative attitude, normal speech, logical thought process, intact associations, appropriate thought content, no suicidal or homicidal ideation, and fair insight, judgment, memory, attention span, concentration, and fund of knowledge." *Id.* On that basis, the ALJ concluded that Nurse Practitioner Thompson's "opinion is not supported by the [facility's] own treatment notes" and therefore is "not persuasive." *Id.*

In sum, the ALJ considered Plaintiff's treatment history, the objective clinical findings, Plaintiff's subjective complaints, and the medical opinions in concluding that Plaintiff has the capacity to perform light work with the limitations set forth in the RFC.

3.    Conclusion of the Five-Step Sequential Inquiry

In conclusion, the ALJ found that Plaintiff has past relevant work as a Child Care Provider. *Id.* at 27.  However, relying on the testimony of the VE at the November 2020 hearing, the ALJ found that Plaintiff cannot perform past relevant work. *Id.*  Continuing to rely on the testimony of the VE, the ALJ next determined that considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. *Id.*  Specifically, again harkening back to the VE's testimony, the ALJ identified three occupations that an individual with Plaintiff's RFC would be able to perform—a Router, Marker, and a Non-Postal Mail Clerk. *Id.* at 28.

## II.    LEGAL STANDARD

A federal district court has jurisdiction over a civil case challenging a final decision of the Commissioner.  42 U.S.C. § 405(g).  A reviewing court must affirm the Commissioner's decision if it is based on substantial evidence in the record and the correct application of the relevant legal standards. *Id.*; *Butler*, 353 F.3d at 999.

"[T]he plaintiff bears the burden of demonstrating that the Commissioner's decision is not based on substantial evidence or that incorrect legal standards were applied." *Lane-Rauth v. Barnhart*, 437 F. Supp. 2d 63, 64 (D.D.C. 2006).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  It requires "more than a scintilla [of evidence] but can be satisfied by something less than a

preponderance of the evidence." *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 365–66 (D.C. Cir. 2003) (quoting *FPL Energy Me. Hydro LLC v. FERC*, 287 F.3d1151, 1160 (D.C. Cir 2002)). "The substantial evidence standard requires considerable deference to the decision rendered by the ALJ." *Crosson v. Shalala*, 907 F. Supp. 1, 3 (D.D.C. 1995).  The reviewing court may neither reweigh the evidence presented to it nor replace the Commissioner's judgment "concerning the credibility of the evidence with its own." *Id.*; *see also Butler*, 353 F.3d at 999 (finding that the district court's role is not to reweigh the evidence but only to determine whether the ALJ's findings are "based on substantial evidence and a correct application of the law").  However, "this standard of review requires the Court to carefully scrutinize the entire record to ensure that the Commissioner, through the ALJ, has both analyzed all of the evidence available and has sufficiently explained his/her reasoning and the weights given to the facts." *Pinkney v. Astrue*, 675 F. Supp. 2d 9, 14 (D.D.C. 2009); *see also Lane-Rauth*, 437 F. Supp. 2d at 65 ("[T]his standard of review 'calls for careful scrutiny of the entire record,' to determine whether the Commissioner, acting through the ALJ, 'has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits[.]'" (second alteration in original) (quoting *Butler*, 353 F.3d 999)).  Moreover, the Court's job is to "consider the grounds actually proffered by the ALJ" rather than to make those determinations for itself, *Ward v. Berryhill*, 246 F. Supp. 3d 202, 210 (D.D.C. 2017), or credit "post-hoc rationalization[s]" advanced by the parties, *Cooper v. Berryhill*, No. 16-cv-1671, 2017 WL 4326388, at *5 (D.D.C. Sept. 28, 2017).  *See also SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (holding that a reviewing court "must judge the propriety of [an agency's judgment] solely by the grounds invoked by the agency"); *Jones v. Astrue*, 647 F.3d 350, 356 (D.C. Cir. 2011) (citing *Chenery*, 332 U.S. at 196).  In applying this standard, courts "must also be mindful of the harmless-error rule. Consequently, even if [the court] perceive[s]

error," it must "affirm the Commissioner's decision unless the error is prejudicial." *Saunders v. Kijakazi*, 6 F.4th 1, 4 (D.C. Cir. 2021).

## III.    DISCUSSION

As noted, Plaintiff's appeal rests entirely on the ALJ's assessment of Plaintiff's RFC, which she contends was flawed.  First, Plaintiff argues that the ALJ erred in his consideration of the medical opinion evidence, specifically with respect to the supportability and consistency factors, as well as the factor pertaining to the medical sources' relationship with the Plaintiff. Second, Plaintiff levels a laundry list of grievances as to the ALJ's consideration of the evidence in the record.  And finally, she contends that the ALJ failed to include Plaintiff's moderate limitations in concentrating, persisting, or maintaining pace in his RFC assessment, rendering as flawed his hypothetical questions to the vocational expert at Plaintiff's hearing.  For the reasons discussed below, Plaintiff's arguments on the first and second issue fail, but the Court will remand on this third issue.

### A.    The ALJ's Assessment of the Opinion Evidence

The Plaintiff makes two arguments for reversal with respect to the ALJ's assessment of the medical opinion evidence.  Plaintiff first submits that the ALJ failed to consider the medical sources' relationships with the Plaintiff when weighing their opinions.  ECF No. 18 at 22.  Second, Plaintiff argues that the ALJ conflated and thus failed to properly consider the supportability and consistency factors that are set out in 20 C.F.R. § 416.920c.  ECF No. 18 at 13–21.  The Court finds that neither argument warrants remand.

As to Plaintiff's first argument, SSA regulations governing claims filed, like this one, after March 27, 2017, provide that an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion," including an opinion from a medical source

who has treated the claimant.[7]  20 C.F.R. § 416.920c(a).  Rather, medical findings from a medical source are evaluated by analyzing (1) the supportability of the opinion—that is, the "objective medical evidence and supporting explanations presented by [the] medical source to support his or her medical opinion []"—and (2) the consistency of the opinion with other evidence in the record. 20 C.F.R. § 416.920c(b)(2), (c)(1)–(2).  Of lesser importance are the medical source's relationship with the claimant, including the length of the treatment relationship, the frequency of examinations, the purpose of the treatment relationship, the kinds and extent of examinations and testing performed, and whether the medical source examined the claimant or merely reviewed evidence; the specialization of the medical source; and "[o]ther factors" such as the medical source's familiarity with other evidence or understanding of the SSA's policies.  § 416.920c(c)(3)– (5).  The governing regulations stipulate that the supportability and consistency factors are the "most important" an ALJ must consider when "evaluat[ing] the persuasiveness of medical opinions."  § 416.920c(a).  As such, ALJs must "explain how [they] considered the supportability and consistency factors for a medical source's medical opinions . . . in [the] . . . decision."  20 C.F.R. § 416.920c(b)(2); *see also   Carolyn W. v. Comm'r of Soc. Sec. Admin*., No. 20-cv-00423, 2022 WL 4244214, at *4 (S.D. Ohio Sept. 15, 2022) ("The regulation therefore imposes a burden of explanation, or mandatory articulation, upon ALJs.").  As for the remaining, less important factors, the ALJ must consider them, "but is not required to" expressly explain that consideration in their decisions.  C.F.R. § 416.920c(b)(2); *see also Morales v. Berryhill*, 484 F. Supp. 3d 130, 143 (S.D.N.Y. 2020) (where the ALJ's "reasoning and adherence to the regulation[s] are clear," a

---

[7] Prior to March 27, 2017, the SSA's regulations required that medical opinions rendered by an individual's treating physician be accorded "'controlling weight' if they are not inconsistent with other substantial record evidence and are well-supported by medically acceptable clinical and laboratory diagnostic techniques." *Butler*, 353 F.3d at 1003 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)).

"slavish recitation of each and every" factor to be considered in assigning weight to a treating source's opinion is not required (*quoting Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013))).

As for Plaintiff's second argument—that the ALJ failed to evaluate both the consistency and supportability of the medical opinions in question—the ALJ's treatment of the medical opinions of Drs. Venkataraman, Haim, Heiser, and Nachbahr can be grouped together, while the ALJ's assessment of Nurse Practitioner Cassandra Thompson's opinion requires separate analysis.

       1.     The ALJ's Evaluation of the Medical Opinions of Drs. Venkataraman, Haim, Heiser, and Nachbahr

Plaintiff's argument that the ALJ failed to evaluate the supportability of the medical opinions of Drs. Venkataraman, Haim, Heiser, and Nachbahr, has merit but the Court ultimately deems that error harmless. ECF No. 18 at 15, 16. Again, SSA regulations require that ALJs "explain how [they] considered" both the consistency *and* the supportability factors when evaluating a medical source's opinion in their decisions. 20 C.F.R. § 416.920c(a). Here, while the ALJ explained how the medical record generally was consistent with the opinions of Drs. Venkataraman, Haim, Heiser, and Nachbahr, he did not explain how those opinions were supported by the doctors' own explanations and/or assessment of the medical evidence concerning Plaintiff's impairments.

Importantly, supportability and consistency are different concepts. "Supportability addresses the extent to which the medical opinion is explained by the provider and supported by objective findings . . . [w]hereas consistency addresses the extent to which a medical opinion is consistent with the record evidence as a whole, including evidence from other medical and nonmedical sources." *Wachholz v. Kijakazi*, No. 20-cv-1412, 2022 WL 787932, at *4 (E.D. Wis. Mar. 15, 2022). Here, the ALJ conflated those concepts with respect to his evaluation of the opinions of Drs. Venkataraman, Haim, Heiser, and Nachbahr. The ALJ stated that each of their

opinions was "both consistent with and supported by the medical evidence of record."  ECF No. 11-2 at 25–26.  He then provided examples from the record evidence consistent with the functional limitations proposed by the doctors.  *Id.*  The ALJ explained, for example, that the finding of Drs. Venkataraman and Haim that Plaintiff could occasionally lift up to 20 pounds was "consistent with the lack of significant impairment with regard to the claimant's upper extremities and numerous findings . . . exhibiting normal strength," and that their finding that Plaintiff could only stand and/or walk for up to two hours, was "consistent with the claimant's history of surgery and observations of cane use throughout her treatment history."  *Id.* at 25.  The ALJ provided similar examples of how the findings of Drs. Heiser and Nachbahr of moderate limitations to Plaintiff's mental functioning were consistent with evidence in the record.  *Id.* at 26.  This analysis is sufficient to satisfy the requirement that the ALJ consider and explain how the doctors' medical opinions were consistent with other evidence in the record.  However, it does not satisfy the supportability requirement that an ALJ evaluate and explain the extent to which the doctors themselves explained the basis for their opinions and relied on objective evidence to reach them.  Stated another way, "[f]or the ALJ to have adequately discussed the supportability of the State agency . . .  opinions, the ALJ needed to evaluate what the State agency [medical providers] said they based their opinion on—not simply how their opinions compared to the record evidence as a whole, which only goes to the consistency of the State agency . . . . opinions."  *Mary W. v. Comm'r of Soc. Sec.*, No. 20-cv-5523, 2022 WL 202764, at *10 (S.D. Ohio Jan. 24, 2022), *report and recommendation adopted sub nom. Wiseman v. Comm'r of Soc. Sec.*, No. 2:20-cv-5523, 2022 WL 394627 (S.D. Ohio Feb. 9, 2022).  Here, the ALJ made no mention of what Drs. Venkataraman, Haim, Heiser, and Nachbahr based their opinions on, so the Court is left with no basis on which to conduct a meaningful review of the ALJ's supportability analysis.  *See Stith v. Kijakazi*, No. 1:20-cv-02312,

2022 WL 493526, at *11 (N.D. Ohio Jan. 31, 2022), *report and recommendation adopted sub nom.*
*Stith v. Comm'r of Soc. Sec. Admin*., No. 20-cv-02312, 2022 WL 485488 (N.D. Ohio Feb. 17,
2022) ("While the ALJ may have intended to consider the supportability and consistency factors
together, he only addresses consistency[,] rending the analysis insufficient.").  That was error.

However, the Court finds this error is harmless because the ALJ either "adopted the
medical opinion [in question] or made findings consistent with the medical opinions."  *See*
*Lorraine R. v. Comm'r of Soc. Sec. Admin*., No. 20-cv-00396, 2022 WL 4232839, at *5 (S.D. Ohio
Sept. 14, 2022) (finding failure to articulate supportability to be harmless error where ALJ
"adopted medical opinion or made findings consistent with the opinion" (quoting *Wilson v.*
*Comm'r of Soc. Sec*., 378 F.3d 541, 547 (6th Cir. 2004))); *see also Davis v. Berryhill*, 272 F. Supp.
3d 154, 177 (D.D.C. 2017) (finding error "stemming from the weight" given to a medical opinion
under prior set of regulations to be harmless error, where findings from the opinion were consistent
with the ALJ's RFC determination).  Here, the ALJ ultimately adopted limitations consistent with
those found by the state agency consultants.  Regarding Plaintiff's limitations resulting from her
mental health impairments, the ALJ found, consistent with the findings of Heiser and Nachbahr,
that Plaintiff had moderate limitations in all domains.  ECF No. 11-2 at 20; ECF No. 11-3 at 7, 22.
Regarding her physical limitations, the ALJ in large part adopted Venkataraman and Haim's
findings and only "out of an abundance of caution regarding [Plaintiff's] physical conditions" did
the ALJ include *additional* limitations in the RFC with regard to her right lower extremity, ability
to climb ladders, ropes, or scaffolds, and ability to tolerate certain environmental exposures.  ECF
No. 11-2 at 25; ECF No. 11-3 at 9–10, 23–24.  The ALJ explicitly stated that such additional
limitations "do not detract from the consistency and supportability" of the opinions; therefore, the
ALJ can fairly be held to have adopted limitations consistent with those found by the state agency

consultants.  ECF No. 11-2 at 25.  Consequently, even though the Court perceives error in the ALJ's articulation of supportability with respect to the opinions of the state agency consultants, because the Court finds that the error is harmless, the Court "affirm[s] the Commissioner's decision" on this basis.  *Saunders*, 6 F.4th at 4.

      2.     The ALJ's Evaluation of the Opinions of Nurse Practitioner Thompson

Plaintiff's argument that the ALJ's evaluation of Nurse Practitioner Thompson's opinions was deficient is not well-taken.  ECF No. 18 at 16–17.  Recall that Nurse Practitioner Thompson opined, among other things, that Plaintiff had marked limitations in her social functioning and was unable to interact appropriately with co-workers or supervisors on a sustained basis, to respond appropriately to typical work situations, or to adjust to changes in the workplace.  ECF No. 11-2 at 26 (citing ECF No. 11-12 at 158–59).  The ALJ found that those opinions were "not consistent with or supported by the very treatment notes from MBI Health," where Nurse Practitioner Thompson practiced, which consistently noted in their mental status examinations that the claimant had a "cooperative attitude, normal speech, logical thought process, intact associations, appropriate thought content, no suicidal or homicidal ideation, and fair insight, judgment, memory, attention span, concentration, and fund of knowledge."  *Id.* That was a sufficient basis for the ALJ to conclude that Nurse Practitioner Thompson was overstating the severity of Plaintiff's limitations and that her opinions in that regard were unpersuasive.

Plaintiff's assertion that the ALJ considered only the consistency factor in evaluating Nurse Practitioner Thompson's opinion is incorrect.  Unlike the ALJ's evaluation of the medical opinions considered above, the inconsistency identified by the ALJ between Nurse Practitioner Thompson's opinion and her own medical facility's treatment notes goes to *both* the supportability and consistency factors, as the ALJ recognized.  *See, e.g., Bruno v. Comm'r of Soc. Sec.*, No. 20-cv-

2633, 2021 WL 6494779, at *8 (N.D. Ohio Dec. 3, 2021) (finding that the ALJ adequately discussed the supportability factor by "highlight[ing] [the physician's] own treatment notes"—which indicated that, among other things, the claimant "had 5/5 strength in her extremities," "full musculoskeletal range of motion," "and a normal gait"—and concluding that the treatment notes "were inconsistent with—and did not support—[the physician's] own assessment" of the claimant's capabilities), *report and recommendation adopted*, 2022 WL 125289 (N.D. Ohio Jan. 13, 2022); *Catherine R. v. Comm'r, Soc. Sec. Admin.*, No. 20-cv-1503, 2021 WL 5235543, at *7 (D. Or. Nov. 10, 2021) (finding that the ALJ adequately discussed the supportability of the physician's opinion that the claimant "was unable to walk a 'city block[ ] without rest'" by contrasting it to "the doctor's own treatment notes that revealed [claimant] presented with a normal gait and normal range of motion in her joints" (quoting the record)).  Though the supportability and consistency factors are distinct, here the analysis of Nurse Practitioner Thompson's opinions overlapped, and the ALJ's consideration of both factors together was appropriate.

Plaintiff's next argument—that the ALJ failed to consider Nurse Practitioner Thompson's treating relationship with the Plaintiff when weighing her opinion—is faulty.  As noted above, unlike the "most important" factors of supportability and consistency, ALJs "may, but are not required to, explain how [they] considered the factors in paragraphs (c)(3) through (c)(5)" of the regulation.  20 C.F.R. § 416.920c(b)(2).  Among the lesser important factors is the medical source's "[r]elationship with the claimant."  § 416.920c(c)(3).  Plaintiff concedes the "ALJ was not required to explain how he considered the treating relationship," but nevertheless submits that "it is clear from the decision that he failed to consider them at all."  ECF No. 23 at 8.  To adopt Plaintiff's argument would be to require that the ALJ articulate their reasoning as to each and every factor.  The governing regulations reject that position, and as discussed above, here the ALJ

articulated good reasons for concluding that—even though Nurse Practitioner Thompson was a treating source—her opinion was unpersuasive.

Finally, Plaintiff's contention that the ALJ should have found Nurse Practitioner Thompson's opinion to be persuasive as other record evidence supports it, misses the mark. The question for this Court is not whether other evidence may have supported the ALJ had he found her opinion persuasive, but whether substantial evidence supports the ALJ's conclusion that her opinion was not persuasive. *See Ali v. Colvin*, 236 F. Supp. 3d 86, 90 (D.D.C. 2017) ("If supported by substantial evidence, the Commissioner's finding must be sustained 'even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's].'" (alteration in original) (quoting *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992))); *see also Hines v. Comm'r of Soc. Sec.*, No. 20-cv-620, 2021 WL 1895011, at *9 (N.D. Ohio Feb. 25, 2021) ("That [plaintiff] can point to other evidence in the record that might have supported [the medical] opinion is unavailing. This court does not review the record to determine whether evidence could have supported a different result, but whether evidence supported the ALJ's decision."), *report and recommendation adopted*, 2021 WL 1571659 (N.D. Ohio Apr. 22, 2021). That is, the critical question is whether the ALJ's actual findings concerning her opinion were supported by substantial evidence. *See Melanie A. S. v. Kijakazi*, No. 21-cv-185, 2022 WL 1721196, at *14 (D.D.C. May 12, 2022) (explaining that, in evaluating ALJ's assessment of physician's opinion, "[t]he question is not whether the evidence supports another conclusion, but rather whether the ALJ's decision is supported by substantial evidence"), *report and recommendation adopted*, 2022 WL 1718987 (D.D.C. May 27, 2022). Here, the ALJ's conclusion that Nurse Practitioner Thompson's opinions were not supported by, or consistent with, the treatment notes from her own medical facility, satisfies that standard.

*Biestek v. Berryhill*, —U.S. —, 139 S. Ct. 1148, 1154 (2019) ("[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency [under the substantial evidence standard] is not high.").

### B.     The ALJ Did Not Fail to Consider Certain Evidence in the Record in Formulating Plaintiff's RFC

Plaintiff devotes the bulk of her brief arguing that the ALJ failed to consider all of the evidence in the medical record in formulating Plaintiff's RFC.  According to Plaintiff, this includes a failure to consider evidence of her mental symptoms; evidence of her physical symptoms; evidence of her daily activities; and finally, evidence regarding the assistance she receives.  ECF No. 18 at 22–35.  Ultimately these arguments amount to impermissible requests for the Court to reweigh the evidence.  Accordingly, these arguments will be rejected.

The Commissioner's findings must be upheld if they are "'supported by substantial evidence' and 'not tainted by an error of law.'"  *Ali*, 236 F. Supp. 3d at 90 (quoting *Porter v. Colvin*, 951 F. Supp. 2d 125, 129 (D.D.C. 2013)).  The question is not, then, whether substantial evidence supports Plaintiff's position, but rather, whether there is "such relevant evidence as a reasonable mind might accept as adequate to support [the Commissioner's] conclusion[s]."  *Id.* at 90 (quoting *Brown v. Bowen*, 794 F.2d 703, 705 (D.C. Cir. 1986)).  That is, "[i]f supported by substantial evidence, the Commissioner's finding[s] must be sustained 'even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's].'"  *Id.* (final alteration in original) (quoting *Rosado*, 805 F. Supp. at 153); *see also Morales*, 484 F. Supp. 3d at 140  ("Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." (quoting *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010))); *Kober v. Apfel*, 133 F.

Supp. 2d 868, 873 (W.D. Va. 2001) ("The Commissioner's decision, 'if supported by substantial evidence, must be affirmed even though the reviewing court believes that substantial evidence also supports a contrary result.'" (quoting *Estep v. Richardson,* 459 F.2d 1015, 1017 (4th Cir. 1972))).

Applying that standard here, none of Plaintiff's challenges to the ALJ's findings succeeds.

### 1.   Plaintiff's Mental Health Symptoms

Plaintiff first argues that the ALJ failed to consider the entire record concerning her alleged mental health symptoms, including evidence regarding her purported hallucinations.  ECF No. 18 at 23.  But again, the Court's task is not to reweigh the evidence, but, rather, to determine whether the ALJ cited sufficient support to back up his findings.  *See Jackson ex rel. M.J.J. v. Berryhill*, 249 F. Supp. 3d 141, 147 (D.D.C. 2017) ("Plaintiff appears to be asking this court to conduct a *de novo* review of the ALJ's decision and reweigh the evidence to determine whether or not the child's limitation in each of the two domains is 'marked.'  Such an evaluation, however, is inconsistent with the applicable standard of review.").  The Court finds that the ALJ's conclusion that Plaintiff is not suffering from debilitating mental health symptoms is supported by substantial evidence.

To support that finding, the ALJ explained that Plaintiff had a history of conservative treatment of her mental health symptoms, "limited predominantly to prescription medications and counseling with no evidence of significant in-patient treatment or hospitalizations."  ECF No. 11-2 at 24 (citing the record generally).  Specifically regarding her hallucinations—and contrary to Plaintiff's assertion that the ALJ ignored these symptoms—the ALJ reasonably observed that "the claimant's treatment appears to be effective in relieving her symptoms," because "the claimant indicated that 'when I take my medications I don't hear voices.'" [8] *Id.* (citing ECF No. 11-9 at

---

[8] Plaintiff relies on Nurse Practitioner Thompson as further support for the debilitating nature of her hallucinations. ECF No. 18 at 6.  But as discussed above, the ALJ reasonably found that Nurse Practitioner Thompson's opinion was

149).   The ALJ also observed that during the relevant period, the Plaintiff had many health examinations where she was reported to be "alert and orientated" with a "logical thought process," and "intact associations." *Id.* (citing ECF No. 11-8 at 430; ECF No. 11-9 at 34, 61, 94, 113, 119, 139, 164, 177, 201, 229, 256, 278, 346, 356, 370, 392, 418; ECF No. 11-10 at 35, 40, 58, 66; ECF No. 11-11 at 208; ECF No. 11-12 at 33, 38, 43, 48, 53, 58, 63, 68, 72, 76-77, 81, 89; then citing the record generally).   Finally, the ALJ contrasted Plaintiff's purported symptoms with her significant activities of daily living, which included references to vacationing in Myrtle Beach for her birthday in May 2019, and records from May 2020 noting that she cooks, reads books, and "like[s] to go do stuff." *Id.* at 24–25 (citing ECF No. 11-9 at 163; ECF No. 11-10 at 36).   Further, the ALJ observed that in Plaintiff's function report, "she indicated that she needs no reminders for personal needs or grooming, can prepare her own meals, and perform household chores without encouragement.   The claimant further indicated that she is able to use public transportation, go shopping in stores, pay bills, count change, handle a savings account, and use a checkbook and money orders.   She also stated that she spends time with others on occasion and is able to go out alone." *Id.*   (citing ECF No. 11-6 at 23–33).   Taken together, substantial evidence supports the ALJ's conclusion that Plaintiff is not suffering debilitating mental health symptoms.

### 2.   Plaintiff's Physical Symptoms

Next, Plaintiff charges that the ALJ ignored evidence from Plaintiff's treating orthopedic doctor and incorrectly assessed her subjective reports of pain.   ECF No. 18 at 26.   Neither attack

---

unpersuasive because it was "not consistent with or supported by the very treatment notes from MBI Health," where she practiced, which consistently noted in their mental status examinations that the claimant had a "cooperative attitude, normal speech, logical thought process, intact associations, appropriate thought content, no suicidal or homicidal ideation, and fair insight, judgment, memory, attention span, concentration, and fund of knowledge."  ECF No. 11-2 at 26.

should be sustained.  Again, the ALJ here marshaled substantial evidence to support his conclusion that Plaintiff is not suffering from debilitating physical impairments.

First, beginning even before the period at issue, the ALJ noted that following Plaintiff's 2017 surgery, she treated her physical ailments conservatively through "through medication and physical therapy throughout 2018," and updated X-rays in April and May of 2018 showed only "mild narrowing of the lateral joint space," "some calcification in the medial and collateral ligaments," and "mild to moderate medial compartment joint space narrowing," with "the right proximal fibular diaphysis in the advanced stages of healing."  ECF 11-2 at 22, 23 (citing ECF No. 11-7 at 150, 191).  Then turning to the period at issue, the ALJ similarly relied on images from October and December 2019 that "noted a healed left tibial plateau fracture with no evidence of hardware complication," and "unremarkable soft tissues," among other results that "are inconsistent with an individual suffering from debilitating musculoskeletal impairments."  *Id.*  at 23 (citing ECF No. 11-9 at 301, 309).  Specifically, with respect to Plaintiff's claim that the ALJ erred in assessing her pain, the ALJ supported this conclusion by contrasting Plaintiff's assertions as to her pain and discomfort with her "treatment history and observations throughout her various medical appointments."  *Id.*  For example, the ALJ reasonably gave weight to the fact that "while the claimant alleged that she experiences near-constant pain and discomfort, she was typically noted to be in no distress throughout her medical appointments from the relevant period."  *Id.*  The ALJ further pointed out that although Plaintiff testified that she could only walk around the corner, "she was also noted to ambulate with a normal gait on multiple occasions."  *Id.*  And although Plaintiff claimed she could carry little to no weight, "she was often noted to have normal strength in her extremities throughout the relevant period"—notably needing "no help changing" for

medical exams, nor any "help getting off the exam table," and being able to "[rise] from the chair without difficulty."  *Id.*

Plaintiff does not meaningfully contest that this analysis of her musculoskeletal condition meets the substantial evidence standard, but instead points to other evidence that she alleges the ALJ failed to consider, including evidence from orthopedist Dr. Debritz who ordered her December 2019 X-rays, as well as related records from George Washington University Hospital where Dr. Debritz's office was located.  ECF No. 23 at 13.  Although Plaintiff is correct that the ALJ's decision does not mention Dr. Debritz or George Washington University Hospital by name, the ALJ made explicit that his findings were made only "[a]fter careful consideration of the entire record."  ECF No. 11-2 at 17, 21.  More, the ALJ does in fact cite Dr. Debritz's records for the proposition that Plaintiff "was typically noted to be in no distress throughout her medical appointments."  ECF No. 11-2 at 23 (citing to, *inter alia*, ECF No. 11-9 at 429, where Dr. Debritz noted that the Plaintiff was in "no acute distress, well appearing and well nourished").  So, Plaintiff overstates the case when she claims that the ALJ's opinion "illustrated his failure to consider [Dr. Debritz's records] in their entirety."  ECF No. 23 at 13.

In any event, "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered in a Social Security disability case."  *Charles v. Astrue*, 854 F. Supp. 2d 22, 30 (D.D.C. 2012) (citing, *inter alia*, *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005)).  Here, because as shown above the ALJ far exceeded the "substantial evidence" standard in concluding that Plaintiff did not suffer from a debilitating physical aliment, her challenge to that finding fails.

### 3. Plaintiff's Activities of Daily Living

Plaintiff next argues that the ALJ's analysis and conclusions with respect to her activities of daily living were erroneous. ECF No. 18 at 31. Here too, Plaintiff's arguments fail. As discussed above, it was entirely appropriate for the ALJ to consider Plaintiff's daily activities in making his findings. *See* 20 C.F.R. § 416.929(c)(3)(i) (listing daily activities as a relevant factor in the subjective complaint analysis). At the same time, the Court recognizes that "[d]isability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." *Smith v. Califano*, 637 F.2d 968, 971 (3d Cir. 1981). Ultimately, Plaintiff's complaints as to this part of the ALJ's analysis do not constitute grounds for remand because the ALJ's discussion of Plaintiff's daily activities formed just one part of a decision that was further supported by opinion evidence and objective medical evidence.

Turning to her specific complaints, Plaintiff argues that the ALJ erred by twice referencing her vacation in Myrtle Beach in 2019 because she testified that she did not take that trip, and even if she had, it would not constitute substantial evidence that she was not disabled. ECF No. 18 at 31. Plaintiff's arguments are unavailing. It was reasonable for the ALJ to discount her testimony denying that she took the trip when records from Nurse Practitioner Thompson documented that in May 2019, Plaintiff reported that, "I am doing good—I went to Myrtle Beach for my birthday." ECF No. 11-9 at 163; *see also* ECF No. 11-2 at 20. In any event, "the credibility determination is solely within the realm of the ALJ." *Grant v. Astrue*, 857 F. Supp. 2d 146, 156 (D.D.C. 2012). Further, while the alleged Myrtle Beach trip *alone* may not constitute substantial evidence, as discussed above, it is just one piece of the larger body of evidence that supports the ALJ's decision that she did not have disabling mental or physical impairments.

Likewise, Plaintiff's argument that "[n]o evidence supports the ALJ's statement that [the Plaintiff] reads books and cooks," is simply incorrect.  ECF No. 18 at 32.  As the ALJ cited, the Plaintiff's MBI records from a telehealth visit in May 2020 documents that she said she was bored with coronavirus because "she likes to go do stuff," and notes that "[Plaintiff] enjoys cooking, reading books, and sometimes listening to gospel music."  ECF No. 11-2 at 24–25 (citing ECF No. 11-10 at 36).  Again, this Court will not reweigh the evidentiary value of Plaintiff's later testimony that allegedly contradicts these records.  The ALJ has already made that determination.

In the same vein, Plaintiff's charge that "[t]he ALJ did not consider the fact that [Plaintiff] leaves her house just once a month, nor the fact that when [she] does leave the house, she is accompanied by a friend to help her navigate public spaces," must also be set aside.  ECF No. 18 at 32.  The ALJ explicitly considered in his decision the fact that Plaintiff needed assistance to perform daily life activities.  ECF No. 11-2 at 22 ("Further, the claimant alleged that *she needs assistance* in performing household chores like laundry and only leaves the house once per month." (emphasis added)).  Thus, the ALJ did not ignore Plaintiff's claims, rather the "ALJ's opinion [made] clear that he recognized and understood [the claimant's] alleged limitations as to her ability to perform daily activities" by "explicitly acknowledg[ing]" such limitations."  *Colter v. Kijakazi*, No. 20-cv-632, 2022 WL 715218 at *14 (D.D.C. Mar. 10, 2022).   Having in fact considered this evidence, the ALJ nevertheless pointed to Plaintiff's trip to Myrtle Beach and indications that she cooks, reads books, and "like[s] to go do stuff" to conclude that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]"  ECF No. 11-2 at 22.  So, like in *Colter*, "[c]ontrary to Plaintiff's insinuations, the ALJ did not ignore or disregard her testimony as to the extent to which she can perform her daily activities.  Rather, as the ALJ

explained, he found that Plaintiff's alleged severity of symptoms was not entirely in accord with her professed daily activities, taking into account the relevant limitations." *Colter*, 2022 WL 715218 at *14.

        4.      Plaintiff's History of Receiving Assistance

Plaintiff's final argument on this front is that in assessing the extent to which Plaintiff's symptoms impair her ability to engage in daily activities, the ALJ also failed to consider evidence regarding the extent of assistance that she receives. ECF No. 18 at 34. Though framed as a separate argument, it largely overlaps with Plaintiff's other arguments, and it is rejected for the same reasons.

Plaintiff is correct that "[t]he ALJ cannot "ignore[] the limited fashion [in which] the plaintiff engages in . . . [her] activities." *Jackson v. Barnhart*, 271 F. Supp. 2d 30, 37 (D.D.C. 2002). But that is not what happened here. As noted above, the ALJ considered that "the claimant alleged that *she needs assistance* in performing household chores like laundry." ECF No. 11-2 at 22 (emphasis added).[9] As for Plaintiff's ability to independently use public transportation, the ALJ, citing Plaintiff's function report, observed that "the claimant further indicated that she is able to use public transportation," and that she "is able to go out alone." ECF No. 11-2 at 20 (citing to ECF No. 11-6 at 28). Though Plaintiff later testified to the contrary, again, the fact that the ALJ relied on a report where the Plaintiff indicated that she could use public transportation, and go out alone, does not mean that he failed to consider Plaintiff's later testimony on the subject. It simply means the ALJ gave more weight to her medical records, as he was permitted to do in making his

---

[9] Similarly, despite Plaintiff's arguments to the contrary, the ALJ also considered Plaintiff's history of treatment from social workers. As the ALJ notes, Plaintiff had a history of receiving "counseling," but there was "no evidence of significant in-patient treatment or hospitalizations due to mental health concerns from the relevant period." ECF No. 11-2 at 24.

credibility determination.  *Grant*, 857 F. Supp. 2d at 156 ("[T]he credibility determination is solely within the realm of the ALJ.").

### C.     The RFC Does Not Adequately Address Plaintiff's Moderate Limitation in Concentrating, Persisting, and Pace

Finally, Plaintiff contends that the ALJ's RFC does not properly account for her moderate limitation in maintaining concentration, persistence, or pace ("CPP").  ECF No. 18 at 38.  On this argument, the Court agrees, finding that Plaintiff's moderate limitations in the CPP domain were not adequately addressed by the RFC.

The CPP domain "refers to the [claimant's] abilities to focus attention on work activities and stay on task at a sustained rate."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E)(3).  The ALJ found here that Plaintiff has a "moderate limitation" with regard to CPP.  ECF 11-2 at 20.  In SSA parlance, a "moderate" limitation means that the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(F)(2)(c).  Though the SSA regulations do not define "fair," as this Court has previously explained, "a moderate limitation in maintaining concentration, persistence, or pace 'necessarily establish[es] some deficit in [the claimant's] ability to sustain focused attention and concentration long enough to permit the timely and appropriate completion of tasks commonly found in work settings.'"  *Nsiah v. Saul*, No. 19-cv-42, 2020 WL 12948519, at *14–16 (D.D.C. May 12, 2020) (alterations in original) (quoting *Terri D. v. Berryhill*, No. 17-cv-22, 2018 WL 4688740, at *8 (W.D. Va. Sept. 28, 2018)); *see also Demetria R. v. Kijakazi*, No. 20-cv-3227, 2022 WL 3142376, at *14 (D.D.C. June 30, 2022), *report and recommendation adopted*, 2022 WL 3139026 (D.D.C. Aug. 5, 2022).

The Plaintiff does not—and could not—argue that her RFC is completely devoid of functional limitations relevant to CPP.  Her RFC is restricted to work that is "simple, routine,

repetitive, low-stress (no strict production quotas, no assembly line pace work) involving occasional interaction with supervisors, co-workers, and the general public; and changes in work duties must be introduced gradually." ECF No. 11-2 at 21. Other courts have recognized that such non-exertional limitations are related to the CPP domain. *See Laura A.* 2022 WL 3644810, at *10; *Mitchell v. Kijakazi*, No. 19-cv-2560, 2021 WL 5310541, at *5 (D.D.C. Nov. 15, 2021). Whether they are sufficient to address Plaintiff's moderate CPP limitation is a separate question.

"An ALJ must tailor a claimant's RFC to his or her specific limitations." *Mirlin T. v. Kijakazi*, No. 20-cv-960, 2021 WL 9217635, at *10 (D.D.C. Aug. 24, 2021), *report and recommendation adopted*, 2022 WL 3139032 (D.D.C. Aug. 5, 2022) (citing *Williams v. Colvin*, 134 F. Supp. 3d 358, 365 (D.D.C. 2015)). To achieve a proper fit, many ALJs attempt to account in the RFC for a "moderate" CPP limitation by restricting the claimant to simple, routine, and/or repetitive work (or some derivation of those limitations), as the RFC does here. These restrictions have received mixed reviews by district courts. *Compare, e.g., Patrice V. v. Saul*, No. 18-cv-2221, 2019 WL 3778771, at *5 (D. Md. Aug. 12, 2019) (finding that limiting the claimant to one to four step routine, repetitive tasks did not, without further explanation, sufficiently address moderate CPP limitations), *and Eichelberger v. Colvin*, No. 16-cv-3299, 2018 WL 2740018, at *2 (D. Md. Apr. 12, 2018) (similar), *with, e.g., Taft W. v. Saul*, No. 19-cv-2781, 2020 WL 7074628, at *4 (D. Md. Dec. 3, 2020) (finding that limiting claimant to one to four step routine, repetitive tasks adequately addressed moderate CPP limitations), *and Stout v. Colvin*, No. 14-cv-2596, 2015 WL 7351503, at *12 (D. Md. Nov. 20, 2015) (similar). Though the D.C. Circuit has yet to weigh in on this issue, district courts have set out some guiding principles that are sufficient to resolve the CPP issue in this case.

"As numerous courts have noted, . . . the problem with finding a moderate CPP limitation by requiring 'simple, routine, and repetitive tasks' is that such a restriction, without more, does not actually address plaintiff's mental impairments because the difficulty of a task does not necessarily say anything about his ability to concentrate on it." *Johnson v. Saul*, No. 19-cv-3829, 2021 WL 411202, at *5 (D.D.C. Feb. 5, 2021). That said, as this Court has explained previously, "it is decidedly not the case that 'an RFC limiting a claimant to,' for example, simple, routine, unskilled, and/or repetitive work and tasks with a limited number of steps 'can *never* be consistent with a moderate limitation in maintaining concentration, persistence, or pace.'" *Laura A. v. Kijakazi*, No. 21-cv-451, 2022 WL 3644810, at *11 (D.D.C. Aug. 24, 2022) (quoting *Nsiah*, 2020 WL 12948519, at *15 n.4). Rather, an ALJ may be found to have adequately accounted for a plaintiff's moderate CPP limitation either (1) by including additional limitations in the RFC relevant to the CPP domain beyond an unadorned "simple, routine, and repetitive tasks" (or its equivalent) restriction, or (2) by "adequately explain[ing] why, notwithstanding [the moderate CPP limitation], [the plaintiff's] overall limitations [ ] 'do not affect [his or her] capacity to sustain simple, routine, or unskilled work.'" *Terri D. v. Berryhill*, No. 17-cv-00011, 2018 WL 4688740, at *8 (W.D. Va. Sept. 28, 2018) (quoting *Perdue v. Colvin*, No. 14-cv-173, 2015 WL 5771813, at *6 (W.D. Va. Sept. 30, 2015)); *see also Nsiah*, 2020 WL 12948519, at *15 n.4 (the critical inquiry is whether the ALJ "explain[ed] how such an RFC is consistent with the claimant's trouble with concentration, persistence, or pace"); *Demetria R.*, 2022 WL 3142376, at *16 n.16. The Court finds that the ALJ did not do either sufficiently in this case.

Addressing the first issue, the Court starts with the premise that "[g]enerally, limiting a claimant to "simple, routine, and repetitive tasks" is insufficient to address a moderate CPP limitation because "the ability to perform simple tasks differs from the ability to stay on task."

*Petty v. Colvin*, 204 F. Supp. 3d 196, 206 (D.D.C. 2016) (quoting *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015)).  Here, beyond simply limiting Plaintiff's RFC to "simple, routine, and repetitive" tasks, the ALJ also restricted the RFC to work that is "low-stress (no strict production quotas, no assembly line pace work) involving occasional interaction with supervisors, co-workers, and the general public; and changes in work duties must be introduced gradually."  ECF No. 11-2 at 21.  These additional limitations are not materially different, however, from RFC restrictions that this Court has rejected in the past as being insufficient to address a moderate CPP limitation.  *See Nsiah*, 2021 WL 372784, at *15 (concluding that an RFC restricting claimant to "simple, routine, unskilled tasks; occasional changes in a routine work setting; and occasional interaction with the public, co-workers, and supervisors" did not adequately account for claimant's moderate CPP limitations); *Mirlin T.*, 2021 WL 9217635, at *10 (finding that the "ALJ's limitations of 'simple work, without fast pace or strict production quotas' did not adequately address Plaintiff's moderate limitations in concentration, persistence, or pace").

In *Mirlin T.*, for example, this Court held that an RFC including a limitation to "simple work without fast pace or strict production quotas" was problematic because such phrases were not "common, vocationally relevant functional limitations," and as they were left undefined by the ALJ, they did not give the judge enough information to conduct meaningful appellate review.  2021 WL 9217635, at *9 (*quoting Thomas v. Berryhill,* 916 F.3d 307, 312 (4th Cir. 2019)); *see also Perry v. Berryhill*, 765 Fed. App'x 869, 872–73 (4th Cir. 2019) (finding that the phrase "non-production oriented work setting" was not a well-defined term of art); *Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015) (discussing how the phrase "fast paced production" without a further definition "would have been impossible for the VE to assess"); *Wendy S. v. Saul*, No. 19-cv-3553, 2021 WL 168444, at *3 (D. Md. Jan. 19, 2021) (finding that the limitation of "no fast pace or strict

production requirements" was unreviewable without further explanation from the ALJ). *But see Johnson v. Kijakazi*, No. 18-cv-2749, 2022 WL 2452610, at *3 (D.D.C. July 6, 2022); *Johnson*, , 2021 WL 411202, at *6 n.5.  The language used in the RFC here—"low-stress (no strict production quotas, no assembly line pace work)"—suffer from the same deficiency in that they are impermissibly vague.  Because the Court is not certain of the limitation created by the phrase and the ALJ did not explain what he meant by it, that ambiguity frustrates this Court's ability to conduct meaningful appellate review of the ALJ's determination.  Furthermore, "if the relevant RFC terms are 'not common enough for [a court] to know what they mean without elaboration' . . . [t]he [c]ourt cannot decisively say that . . . the [vocational expert] would have identified the same, or any, positions the hypothetical person could perform." *Geneva W. v. Comm'r, Soc. Sec. Admin.*, No. 18-1812, 2019 WL 3254533, at *3 (D. Md. July 19, 2019) (internal citation omitted); *see also Thomas*, 916 F.3d at 312.

Notably, the Commissioner has not identified any authority where a court found limitations similar to those imposed by the ALJ here to be adequate to account for a moderate CPP rating. Instead, the Commissioner submits that Plaintiff's arguments are foreclosed by the fact that the Social Security Regulations were updated in January 2017.  ECF No. 20 at 32.  Specifically, the Commissioner emphasizes that the SSA's regulations define the word "moderate" as a "fair" ability to function in a particular area. *Id*. (citing 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(F)(2)(c).  The Commissioner thus concludes that "[p]laintiff's ability to 'stay on task' is therefore addressed, up front, with the 'moderate' rating: her ability to function in that area 'on a sustained basis' is 'fair.'" *Id.*  But this argument misses the point.  As explained above, regardless of the specific meaning of "fair," a "moderate" limitation in CPP "necessarily establishe[s] some deficit in [the claimant's] 'ability to sustain focused attention and concentration' long enough 'to

permit the timely and appropriate completion of tasks commonly found in work settings.'" *Terri D.*, 2018 WL 4688740, at *8 (quoting 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(C)(3) (2015)). The Commissioner cites no authority for the proposition that the CPP issue can be disposed of simply by observing that the updated SSA's regulations define the word "moderate" as a "fair" ability to function in a particular area. Indeed, many of the cases discussed above grappled with this CPP issue well after the SSA's regulations were updated in 2017, and notwithstanding the new regulations "a 'moderate' limitation in CPP is still significant in the subsequent RFC analysis." *Laura A.*, 2022 WL 3644810, at *11.

Having determined that the RFC the ALJ assigned failed to include limitations adequate to account for Plaintiff's moderate CPP rating, the Court next searches the ALJ's opinion for any explanation as to why the ALJ might have concluded that such limitations were unnecessary in light of the record. That review establishes that the ALJ assigned a moderate CPP rating, assigned an RFC that failed to adequately account for Plaintiff's concentration issues, and provided this Court with no explanation as to why additional concentration-based limitations were unnecessary.

Finally, the Commissioner advances no argument that the ALJ's failure to account for Plaintiff's moderate CPP limitations constituted harmless error.[10]  Given this Court's conclusion that Plaintiff's moderate CPP limitations were not adequately addressed by the RFC, and that the ALJ's question to the vocational expert included only the limitations outlined in the RFC, *see* ECF No. 11-2 at 58, the Court concludes that the ALJ may not have provided an accurate hypothetical

---

[10] Errors of this kind have previously been considered harmless if "(1) medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace and that the hypothetical question given to the expert is limited to only include only unskilled work or (2) the hypothetical otherwise implicitly account[s] for a claimant's limitation in concentration, persistence, and pace[.]" *Mirlin T.*, 2021 WL 9217635, at *11 (quoting *Petty*, 204 F. Supp. 3d. at 206) (internal quotation marks omitted). The Commissioner makes no effort to apply standard here, and the Court will not make that argument for her. In any event, for the reasons stated previously, it does not appear that such a showing could be made based on the record here.

question to the vocational expert. *See Petty*, 204 F. Supp. 3d at 205 (an ALJ's failure to convey accurately the claimant's limitations to the expert can serve as grounds for reversal because it "undermines the expert's testimony that a claimant can perform other work," an instrumental aspect of determining whether the claimant qualifies for disability benefits). Accordingly, the Court will grant the Plaintiff's motion for remand on this basis.

## IV.   CONCLUSION

For the reasons stated above, the Court will enter an Order **DENYING** Defendant's motion for judgment of affirmance (ECF No. 20), **GRANTING IN PART** Plaintiff's motion for judgment of reversal (ECF No. 18) to the extent that it seeks remand to the Social Security Administration for further administrative proceedings, **DENYING IN PART** to the extent that it seeks reversal, and **REMANDING** this case to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

Date:  April 21, 2023

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE